Don B. EDISON, Plaintiff-Appellant,

v.

DEPARTMENT OF THE ARMY, Defendant-Appellee.

No. 80–7999.

United States Court of Appeals, Eleventh Circuit.

April 5, 1982.

Kennedy & Kennedy, Reid W. Kennedy, Marietta, Ga., for plaintiff-appellant.

Myles E. Eastwood, Asst. U. S. Atty., Atlanta, Ga., for defendant-appellee.

Before GODBOLD, Chief Judge, RONEY and WOOD *, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

Appellant, Don B. Edison ("Edison") brings this appeal from a *de novo* trial under the Privacy Act, 5 U.S.C. § 552a. Edison, a former Army officer, alleges that he was twice erroneously passed over for promotion by Appellees, the United States Army and then, by statute, released from active duty. 10 U.S.C. § 3303(a), (d)(3); Army Regulation 635–100. Edison alleges that the Army Board for Correction of Military Records acted in an arbitrary and capricious manner by failing to timely correct the errors in his personnel records and to send his records to a Stand-by Promotion Board.

The case was tried without a jury and the district court made 49 findings of fact and nine conclusions of law. Edison appeals the court's findings that he did not establish (1) that the Army acted unreasonably in maintaining its records; (2) that either the 1976

* Honorable Harlington Wood, Jr., U. S. Circuit Judge for the Seventh Circuit, sitting by designation.

or 1977 Lieutenant Colonel Promotion Board for the Army of the United States ("the Promotion Board") saw an Officers Record Brief ("ORB") with an incorrect rating; (3) that the level of clearance shown on his ORB proximately caused his nonselection for promotion in either year; and (4) that any inaccuracy which may have occurred was made wilfully and deliberately by the Army. We affirm.

## I.

Edison was serving as a major in the Military Intelligence Branch of the Army with over 16 years continuous active duty service when he was considered for promotion to the grade of Lieutenant Colonel by the April 1976 Promotion Board. Edison held a Top Secret Security Clearance from 1974 until his release. In 1976, after he was notified that he was not promoted, he requested a copy of his records. After finding certain alleged errors, he filed an application with the Army to correct his military records. He was considered again for promotion by the 1977 Promotion Board in April, 1977. Edison was again not selected for promotion.

Edison claims that he was not promoted because the Army recorded his security clearance as "Confidential" rather than "Top Secret" on the ORBs presented to the Promotion Boards. Appellant also contends that his nonselection was caused by a temporary loss of his Military Occupational Specialty ("MOS") after marrying a German national, even though he regained the rating upon her naturalization.[1] After exhausting his administrative remedies under the Privacy Act, Edison filed a complaint alleging violations of the accuracy of records portions of the Privacy Act. 5 U.S.C. §§ 552a(e)(5), (g)(1)(C), (g)(1)(D).

---

1. This argument is unclear because Edison does not contend that he did not lose the rating, only that losing it may have caused his nonselection.

2. The term "agency" includes any military department. 5 U.S.C. § 552(e).

## II.

Edison has the burden to prove that there has been a violation of the Privacy Act. *Mervin v. Federal Trade Commission*, 591 F.2d 821, 827 (D.C.Cir.1978). When a plaintiff seeks disclosure of records under the Privacy Act, subsection (g)(3) of that Act states that the agency bears the burden of proving that the records should not be disclosed. Subsection (g)(4), concerning damages as requested in this suit, contains no provision allocating the burden of proof. Therefore, we agree with the district court that the traditional rule imposing the burden of proof on the plaintiff should apply.

The district court found that Edison failed to prove that the Army acted unreasonably in its efforts to maintain accurate, relevant, timely, and complete records. The Privacy Act seeks to insure informational quality by requiring governmental agencies[2] to

maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is *reasonably* necessary to assure fairness to the individual in the determination.[3]

Section 552a(e)(5) (Supp.1976) (emphasis added). For violations of this standard, the Act further provides:

(g)(1) Civil remedies.—Whenever any agency

\* \* \* \* \* \*

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and *consequently a determination is made* which is adverse to the individual;

\* \* \* \* \* \*

---

3. In like manner, section 552a(e)(6) (Supp. 1976) mandates that agencies "make *reasonable* efforts" to see that the "records are accurate, complete, timely, and relevant" before "disseminating [them] to any person other than an agency." (emphasis added).

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to *have an adverse effect* on an individual,

the individual may bring a civil action against the agency, and the district court of the United States shall have jurisdiction in the matters under the provisions of this subsection.

\* \* \* \* \* \*

(g)(4) In any suit brought under the provisions of sub-section (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was *intentional or willful,* the United States shall be liable to the individual, in an amount equal to the sum of—

(A) actual damages sustained by the individual as a *result* of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(1), (4) (emphasis added).

■ First, Edison contends that it is not sufficient for the Court to find that the Army took reasonable steps to maintain its personnel files since subsection (g)(1)(C) of the Act does not use the word "reasonable." Subsection (e)(5), however, requires the Army to act "reasonably." If we accepted Edison's interpretation, it would render subsection (e)(5) of the Act meaningless. The Army would be strictly liable for any inaccuracy, no matter how small or how reasonably the agency acted.

As Appellant admits, however, "No system of record keeping will ever attain perfection." Subsection (g)(1) must be read *in pari materia* with subsection (e)(5). If the court determines that the agency has done what is reasonable in assuring the accuracy of the information, no more is required.

*Savarese v. United States Dept. of Health, Education & Welfare,* 479 F.Supp. 304, 306–07 (N.D.Ga.1979), *aff'd mem.,* 620 F.2d 298 (5th Cir. 1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981); *Smiertka v. United States Department of Treasury,* 447 F.Supp. 221, 226 n.35 (D.D.C. 1978), *remanded on other grounds,* 604 F.2d 698 (D.C.Cir.1979). The use of "reasonableness" language requires the balancing of competing interests: army resources and the ability to assure accurate and complete records versus the likelihood that inaccurate and incomplete records will cause injury to the individual. *Smiertka,* 447 F.Supp. at 226 n.35. Edison must therefore prove that the Army acted unreasonably.

■ The district court adequately reviewed the evidence concerning the issue of reasonableness. The Army maintains an Officers Master File ("OMF"), a computerized data base which includes data entries on over 100,000 officers. It also maintains an ORB, a summarized computerized extract from the OMF. To overcome the possibility of errors in data, the Army employs quality control measures when entering data. Moreover, it annually sends a hard-copy ORB printout to each officer. The officer reviews the ORB and other personnel files in an annual audit, identifies any errors, and indicates what corrections should be made. These corrections are mailed to the Military Personnel Center (MILPERCEN) in Washington, D.C. for entry into the OMF data base. Because of constant transfers of officers to new duty stations, new medals, changes in language proficiencies, and military schooling, up to 80% of these records need change during a periodic update.[4] The corrected field copy of the ORB is retained for a year and then discarded because of their volume and the limited space available.

There are three ways for an officer to know if a correction has been made to his OMF and ORB. He may request a copy of the corrected ORB or request that his Ca-

---

**4.** These updates occur during three different cycles each month and are keyed to the offi-

cer's birth month.

---

reer Manager (in the Army Central Headquarters) verify that a change has been made. The final procedure, and the method Edison used, was to review his personnel file at the annual audit, where any necessary corrections and updates could again be made. Given the large number of officers appearing each year before a promotion board [5] and the large number of boards, we agree with the district court's finding that the Army was not unreasonable in its efforts to maintain proper records.

### III.

█ The district court found that Edison failed to prove that either the 1976 or 1977 Promotion Board in fact saw an ORB on Edison reflecting a Confidential security clearance. The ORBs which were seen by the Promotion Boards were printed two to three weeks before the Board's convening date and bear a Control Number 1300. The actual ORBs were destroyed after the Promotion Boards finished their review of files. In order to determine what clearance the Promotion Boards actually saw, the district court viewed a number of Edison's hard-copy ORBs printed for other purposes (e.g., for the Career Manager in making duty assignments) and not for the Promotion Boards.[6]

MILPERCEN "dumps" the contents of the "living" OMF onto a separate computer tape at the end of the fiscal and calendar year. The dumped "historical" OMFs can be printed out at any later time, but will show only the data which were on the record at the time of the dump. After the OMF is "dumped," MILPERCEN continues to make changes and updates to the original tape which is a "living" file. When an ORB is printed, it comes from the "living" OMF.

Edison first questions the ORB that went to the 1976 Promotion Board. Since the 1976 Promotion Board met in April-May 1976, the ORB would have been printed in March, 1976. The 1975 and 1976 OMF correctly showed Edison's clearance as Top Secret, and both showed that Edison had audited them in April 1975 and April 1976, respectively. The district court thus found that there was no showing of an incorrect ORB before the April-May 1976 promotion board.[7]

The 1977 Promotion Board met from April-May, 1977. The ORB which went to the Board would have been printed in March 1977, using February 1977 data.[8] Since there was no data for January or February, the district court looked at the next closest data. The "historical" December 1976 OMF showed a Top Secret clearance at the end of calender year 1976; the March 1977 ORB showed a Confidential clearance. As the district court found, it would be mere speculation to say what appeared in the "living" OMF in January or

---

5. Edison was one of 2,962 and 2,677 majors before the 1976 and 1977 Boards, respectively.

6.

| Type of Document | Date prepared | Audit date | Clearance Shown |
|---|---|---|---|
| OMB | Jan. 1975 | -- | Top Secret |
| OMF | Dec. 1975 | April 1975 | Top Secret |
| OMF | Dec. 1976 | April 1976 | Top Secret |
| ORB | March 1977 | April 1976 | Confidential |
| ORB | April 1977 | March 1977 | Confidential |
| ORB | May 1977 | March 1977 | Confidential |
| ORB | July 1977 | March 1977 | Top Secret |

The Audit date is the date Edison would have reviewed the ORB, made corrections, and signed the ORB. Whether or not an ORB printed out at a previous time has the same information as one presented to a Promotion Board depends on whether an update cycle has been run between the two preparation times.

7. The district court addressed Edison's argument that the April 1976 audit date on the March 1977 ORB supported an inference that the 1976 Promotion Board ORB showed a Confidential clearance. The court rejected this argument because Edison overlooked the December 1976 OMF and year end audit process. The December 1976 OMF shows a Top Secret clearance and the district court found no evidence showing any irregularity before the April-May 1976 Promotion Board.

8. Since the "living" OMF is updated during three different cycles each month, a printout would normally use information from the prior month's update. Thus, the March 1977 ORB (showing a Confidential clearance) would not have been printed out until April 1977 *after* the Board had convened. The ORB which went to the Promotion Board would have used February 1977 data.

February, 1977.[9] Thus, we agree with the district court that Edison failed to prove that either the 1976 or 1977 Board saw an ORB reflecting a confidential security clearance.

## IV.

■ The Privacy Act requires a causal relationship between the allegedly erroneous record and an adverse determination based on that record. Subsection (g)(1)(C) of the Act uses the phrases "in any determination ... that may be made on the *basis* of such record, and *consequently* a determination is made which is *adverse* to the individual." (emphasis added). Subsection (g)(1)(D) similarly contains the phrase "fails to comply with any other provision ... *in such a way as to have an adverse effect* on an individual." (emphasis added). The courts have the duty "to give effect to the intent of Congress, and in doing so our first reference is ... to the literal meaning of the words employed." *United States v. Second National Bank of North Miami*, 502 F.2d 535, 539–40 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777. The district court properly required Edison to prove proximate cause. *See Bruce v. United States*, 621 F.2d 914, 917 n. 9 (8th Cir. 1980); *see also United States v. Second National Bank of North Miami*, 502 F.2d 535, 539–40 (5th Cir. 1974).

■ The district court found that Edison did not prove that either his level of clearance as shown to either Promotion Board or his temporary loss of MOS was the cause of his non-promotion. The district court heard extensive and detailed evidence on what factors the Promotion Board members considered most important in determining promotability. We summarily review this evidence, not to reiterate what the district court did, but to show the reasonableness of its findings and the level of competition Edison faced.

A security clearance of any specific level is not a prerequisite for promotion in the Army. Although some military intelligence officers require top secret levels of clearability, the level of security clearance does not measure the merit of someone's past service or his potential in the next higher rank. A security clearance is temporary and can fluctuate. The type of security clearance and its level are functions of (a) the officer's job and (b) the necessity for the officer in the performance of that job to have access to the given level of classified information. All officers experience normal reduction in clearance with periodic changes in jobs.

Most promotion boards run in the same manner. The testimony indicated that the Promotion Board is governed by its letter of instruction,[10] and verbal briefing from a senior officer at MILPERCEN.[11] A Promotion Board member's normal procedure would be to first look at the officer's ORB to get an overall picture of that officer's career. The Board member would review the history of assignments and the officer's qualifications. A highly competitive officer would have completed the Command and General Staff School course, and have other highly competitive types of assignments. Edison had none of these.

9. Edison attempted to infer that the "living" OMF contained a confidential clearance from an ambiguous phrase in Exhibit 50. The 1979 memorandum mentions "an erroneous entry on the ORB." The district court, in light of the other uncontroverted evidence, properly gave little weight to this phrase since it does not establish that the Promotion Board actually saw a Confidential clearance on Edison's ORB.

10. One letter of instruction to a promotion board, for example, stated:
Specific qualifications necessary for promotion are not prescribed by the Department of the Army. Accordingly, no single factor

should be allowed to become overriding; however, non-selection can properly be based on a major disciplinary action, relief for cause, demonstrated cowardness or lack of integrity, moral turpitude or professional ineptitude.

11. Board members were verbally briefed, for example, that:
"The board must consider the officer's entire record in arriving at its conclusion," and "Remember also that one poor efficiency report in and of itself should not be basis for non-selection (sic)."

The Board members also consider information in the Officer Efficiency Reports ("OER"), the most important item to the Promotion Boards. At least 65% of the Majors before the 1976 Board had perfect or near perfect scores on their OERs. Similarly, a large number of Majors before the 1977 Board had perfect or near perfect scores. While Edison's scores were good, they were not fully competitive.

The testimony indicated that if the question of proper clearance had come up, the Promotion Board would have telephoned Edison's unit to ascertain the true clearance. It was stipulated that the unit's personnel files in 1977 properly showed the Top Secret clearance and SCI clearability. Therefore, if the question had come up, the Board would have acquired the correct clearance.

The testimony also indicated that marriage to a foreign national is a common occurrence among career officers and that temporary loss of MOS may occur until the spouse becomes a naturalized citizen. This has nothing to do with an officer's competitive standing and does not affect promotion chances. A number of Board members testified that a security clearance and temporary loss of MOS due to marriage to a foreign national are not important to Promotion Boards. Moreover, not one of the Board members even heard this topic raised.

We agree with the district court that Edison failed to show that the Promotion Board considered his level of clearance in determining his suitability for promotion. Rather, the testimony indicated that an officer's OER's, medals and decorations, and history of assignments were the basis for his being considered for promotion.

## V.

Edison contends that he is not required to show that the inaccuracy in his records was made wilfully and deliberately by the Army. The district court found that there was no wilful or deliberate violation of the Privacy Act. Of course, if there was no violation, there could be no wilful or deliberate violation. Moreover, the legislative history of the Act reveals that the standard for recovery of damages is viewed as somewhat greater than gross negligence.[12] Since Edison failed to prove that the Army acted unreasonably in maintaining its records, the district court properly found that he failed to prove that the Army acted wilfully or deliberately.

Finally, Edison attacks the district court's ruling that the court only has jurisdiction to correct records[13] and award damages under the Privacy Act and not to grant more meaningful relief with regard to his promotion. The Privacy Act, however, authorizes the courts to issue injunctions in only two instances: to amend (i.e. correct) the individual's record, 5 U.S.C. § 552a(g)(2)(A), and to order an agency to produce agency records improperly withheld from an individual, 5 U.S.C. § 552a(g)(3)(A). *Parks v. United States Internal Revenue Service*, 618 F.2d 677, 683–84 (10th Cir. 1980); *Cell Associates v. National Institutes of Health*, 579 F.2d 1155, 1161–62 (9th Cir. 1978); *Houston v. United States Department of Treasury*, 494 F.Supp. 24, 29 (D.D.C.1979). The Act fails to authorize injunctive relief against violating the Act in other ways. Where a statute provides for certain types of relief, but not others, it is not proper to imply a broad right to injunctive relief. *Parks*, 618 F.2d

12. The standard reflects a compromise between the original House and Senate versions. The standard for recovery of damages under the House bill was a determination by a court that the agency acted in a manner which was wilful, arbitrary, or capricious. The Senate bill would have permitted recovery against an agency on a finding that the agency had erred in handling his records. On a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct, willful or deliberate is viewed as somewhat greater than gross negligence. *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, reprinted in* 120 Cong.Rec. S 40405, 40406 (1974); 120 *Cong.Rec.H.* 40881, 40882 (1974).

13. Edison admits his records are now correct and have been correct since July 1977.

at 684; *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, reprinted in* 120 *Cong.Rec.* 40405, 40406 (1974).

After Edison left active duty, he joined the drilling reserve and his Army records show that he now has a Top Secret clearance. Because Edison's records are correct, there is no basis for injunctive relief. *Parks v. I.R.S.*, 618 F.2d at 684. Also, because Edison failed to prove wilful or deliberate action, damages are not available. Hence, the district court properly ruled that it had no authority to grant Edison any relief. Because Edison did not prevail on the elements of liability, the district court properly made no findings on the evidence concerning quantum and mitigation of damages.

The judgment of the district court is AFFIRMED.