**Jane DOE, Appellant,**

**v.**

**UNITED STATES of America, et al.**

**No. 84-5613.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1986.

Decided June 19, 1987.

Wendy M. Keats, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph

E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, were on the brief, for appellees.

Bruce J. Terris, with whom Monica Blong Wagner, was on the brief, for appellant.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, BORK, STARR, SILBERMAN, BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

Dissenting opinion filed by Chief Judge WALD.

Dissenting opinion filed by Circuit Judge MIKVA, with whom Circuit Judges SPOTTSWOOD W. ROBINSON, III, and HARRY T. EDWARDS join.

RUTH BADER GINSBURG, Circuit Judge:

This case arises under the civil remedies prescriptions of the Privacy Act, 5 U.S.C. § 552a(g). The appeal requires this court to construe the Act's prescriptions authorizing court-ordered correction when an agency refuses to amend an individual's record, *id.* § 552a(g)(1)(A), and thereby "fails to maintain [the] record ... with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness ... to the individual." *Id.* §§ 552a(g)(1)(C) & (g)(2)(A). The controversy centers on a State Department report of investigation (ROI) concerning a March 26, 1981 unwitnessed interview; the interviewee was plaintiff-appellant Jane Doe,[1] then an applicant for a position in the foreign service; the interviewer was Department Special Agent Billy N. Hughes.

The ROI in question contains the agent's and Doe's sharply conflicting accounts of what Doe said at the interview; it reports that "[t]here is no reason to doubt the statements made by [the] [a]gent,"[2] but it does not announce which account—Doe's or the agent's—the Department believes. The precise issue before us is whether the ROI so maintained satisfies the Privacy Act standard, directed initially to the agency, then to the reviewing court, that all records concerning individuals be maintained with "such accuracy ... and completeness as is necessary to assure fairness ... to the individual." *Id.* § 552(g)(1)(C) (court remedy); *see id.* § 552a(e)(5) (agency requirement).

Doe sought primarily an order requiring not correction of the March 1981 ROI, but its physical removal from her files; she also requested damages.[3] The district

---

1. At her request, and by order of the district court, the plaintiff is proceeding anonymously in this case.

2. Supplemental Report of Investigation, March 31, 1981, as Amended by the Provisions of the Privacy Act on April 13, 1982, at 4, *reproduced in* Joint Appendix (J.A.) at 29, 32.

3. Damages are available when "the agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). *See infra* note 8.

In the district court, Doe cast her entire case in a procedural frame. She asserted that the Privacy Act required certain procedures—a full investigation that would include interviewing Doe, affording Doe an opportunity to cross-examine agent Hughes, contacting other individuals who might have relevant information. Because the Department had not conducted such an investigation, Doe maintained, the case occasioned no need for any district court inquiry into the truth or falsity of Doe's account or the agent's. Instead, Doe urged, the Department's failure to conduct an extensive investigation, in and of itself, entitled her to an immediate expungement remedy and an award of damages. *See Doe v. United States*, Civil Action No. 83–951, slip op. at 8 (D.D.C. July 6, 1984). The district court held that the Act does not dictate to agencies any particular procedures for determining the accuracy of records, *id.* at 9, and Doe has not argued otherwise before the en banc court. The legislative history, we note, speaks clearly to the point. *See* S.REP. No. 1183, 93d Cong., 2d Sess. 1–2, 59–63 (1974), U.S.Code Cong. & Admin.News 1974, p. 6916 (final version of Act advertently dropped provision of Senate bill (subsection 201(d)(2)(F) of S. 3418) that would have required agency, at the individual's request, to hold a hearing in order to resolve accuracy challenge); 120 CONG.REC. 40407 (daily ed. Dec. 17, 1974) (section-by-section analysis of House and Senate Compromise Amendments to the Federal Privacy Act by Senator Ervin), *reprinted in* LEGISLATIVE HISTORY OF THE PRIVACY ACT OF 1974, S. 3418 (PUBLIC LAW 93–57–9), at 862 (1976).

court, on cross motions for summary judgment, denied Doe's motion and granted the government's. *Doe v. United States,* Civil Action No. 83–951 (D.D.C. July 6, 1984). In the circumstances presented, the district court concluded, the Privacy Act did not require the judge "actually to determine what was said during the March 26, 1981 interview"; instead, it sufficed for the court to determine whether the ROI, as the Department maintained it, was as "accurate as is reasonably necessary." *Doe, supra,* slip op. at 10, 11.

The district court ultimately ruled that, except for specific, relatively minor amendments, which it ordered to clarify the March 1981 ROI,[4] that report, as maintained by the State Department, was as "accurate" as was "necessary to assure fairness" to Doe. We hold that the district court correctly defined the responsibility Congress assigned to the recordkeeping agency and to the reviewing court in the Privacy Act, and we affirm the district court's judgment.

## I.

In the fall of 1980, plaintiff Jane Doe applied to the State Department for a position in the foreign service. The Department pursued the background investigation routine for such applications. As part of the investigation, on January 23, 1981, Doe was interviewed by Department Special Agent, Billy N. Hughes. Notable discrepancies appeared when the Department checked Doe's application and her responses at the January 23 interview against her military and Veterans Administration (VA) records. In particular, Doe had answered "no" on State's application form to an inquiry whether she had "ever had medical treatment for a mental condition." Her military and VA records revealed, however, that she was receiving a disability pension

from the United States predicated in significant part on a mental condition.

To obtain Doe's explanation for this and other apparent inconsistencies between her current representations and her prior records, the Department instructed its agent Hughes to reinterview Doe. Hughes did so on March 26, 1981. According to Hughes, Doe explained at this second interview that she in fact suffered from no mental condition, but had dishonestly claimed to have a depressive condition in order to obtain disability pay, with its tax advantage over straight retirement pay; Hughes further reported that Doe expressed regret about what she had done. Doe denies ever having made the incriminating statements agent Hughes attributed to her.

Doe did not pursue her foreign service officer application, for she obtained a high level position in another agency. When she encountered a problem gaining a security clearance at that other agency, she obtained from State, in response to her Privacy Act request, portions of the March 1981 ROI, and began the process of seeking to have the report expunged.

Doe submitted long affidavits and legal memoranda explaining, *inter alia,* that her original depressive symptoms, as later diagnosis revealed, had in fact been hormonally caused and were now corrected by medication. Following the correction of her diagnosis, however, she continued to accept disability retirement benefits based in part (30%) on a "nervous condition." *See* Joint Appendix (J.A.) at 51. Doe's counsel observed that Doe had "sent the VA a physician's report on April 30, 1982, which stated ... that she was no longer suffering from depression"; counsel further asserted that "[it] was the VA's, not [Doe's] responsibility to review [her] disability benefits based on current medical

---

**4.** The district judge instructed, *inter alia,* clearer delineation of the opposing accounts of what was said at the March 26, 1981 reinterview. He ordered inclusion of an introductory "sentence indicating that Agent Hughes and the plaintiff dispute what was said at the March 26, 1981 reinterview and that the ROI contains each of their conflicting descriptions." *Doe,* slip op. at

11–12. The court also instructed the Department to identify clearly the source of each informational passage in the ROI and, particularly, to preface "each passage of Agent Hughes's report of the interview" with these words: "Agent Hughes reports that the [plaintiff] stated at the March 26, 1981 interview...." *Id.* at 12.

information." Appellant's Reply Brief at n. 3.

The State Department analyzed Doe's submissions in detail. State contacted agent Hughes and obtained his specific responses to Doe's allegations that he had misrepresented what she had said;[5] State also checked or rechecked Doe's VA file and educational records. The Department ultimately ordered (1) that the ROI in question be amended in small particulars, and (2) that Doe's account of "what she said or did not say" at the March 26, 1981 interview "be made part of the record without affirming or denying her allegations."[6] The Department further stated: "The record should also indicate that there is no reason to question the integrity of Agent Hughes."[7] Doe commenced this action when State refused to expunge or further amend the March 1981 ROI.[8]

## II.

The Privacy Act speaks first and foremost to agencies. It directs them, *inter alia*, to

> maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness

as is reasonably necessary to assure fairness to the individual in the determination[.]

5 U.S.C. § 552a(e)(5); *see also id.* § 552a(e)(6) (agency shall "make reasonable efforts to assure" that records it disseminates to persons other than an agency "are accurate, complete, timely, and relevant *for agency purposes*") (emphasis supplied). The Act also details the rights of individuals to gain access to records pertaining to them, *id.* § 552a(d), and to request agency correction of "any portion [of a record] which the individual believes is not accurate, relevant, timely, or complete." *Id.* § 552a(d)(2)(B)(i). Finally, the Act speaks to the courts. An individual may bring a civil action in federal district court challenging an agency's determination not to amend the individual's record. *Id.* § 552a(g). "In such a case the court shall determine the matter de novo." *Id.* § 552a(g)(2)(A).

■ To pare this controversy down to its core, we address first the question whether the term "de novo" in the above quoted sentence means something less than what that expression generally signals. We hold that the term has no different, diminished meaning in the context at hand. De novo means here, as it ordinarily does, a fresh,

---

**5.** Doe charged that Hughes had engaged in "sexual misconduct" during the March 1981 interview and implied that her reaction caused him to distort and falsify the interview report. The State Department promptly investigated this charge. It reviewed Doe's written statements relating to the sexual misconduct accusation, and it conducted a transcribed interview with Doe in the presence of counsel. Based on this investigation, the Department found Doe's allegations of sexual misconduct on the part of agent Hughes to be "without merit." Supplemental Report of Investigation, *supra* note 2, at 20, *reproduced in* J.A. at 48. Doe does not challenge that fact finding.

**6.** Memorandum to Marvin L. Garrett, Jr., Deputy Assistant Secretary for Security, from Caron A. McConnon, Acting Chief (undated), at 16, *reproduced in* J.A. at 49, 64.

**7.** *Id.* Earlier in the Department's response to Doe's request for amendment of the March 1981 ROI, State explained with particularity, that "[t]here is no indication that Agent Hughes acted in any manner other than what was expected of him." *Id.* at 12, *reproduced in* J.A. at 60.

**8.** Doe cites in her complaint only two Privacy Act sections: 5 U.S.C. § 552a(e)(5), set out in the text on this page (requirements imposed on agencies regarding record maintenance), and 5 U.S.C. § 552a(g)(5) (general prescriptions on actions "to enforce any liability created under this section"), Complaint paras. 3, 29, and does not delineate two separate "actions." We acknowledge, however, that Doe's complaint does seek two kinds of affirmative relief—injunctive relief in the form of expungement of the March 1981 ROI, and damages. *See* Complaint, Prayer for Relief. Judge Mikva's dissent entitles the first remedy an "amendment action" under 5 U.S.C. § 552a(g)(1)(A) & (g)(2)(A), and the second, a "redress action" under 5 U.S.C. § 552a(g)(1)(C) & (g)(4). *See* Dissent of Judge Mikva at 707, 712–13. Nonetheless, whether the nature of the relief sought is injunctive or monetary, the standard against which the accuracy of the record is measured remains constant. That standard is found in 5 U.S.C. § 552a(e)(5) and reiterated in 5 U.S.C. § 552a(g)(1)(C). *See infra* note 10.

independent determination of "the matter" at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion. *See, e.g., Augustine v. McDonald,* 770 F.2d 1442, 1444 (9th Cir. 1985) (appeals court reviews grant of summary judgment de novo, which means it "appl[ies] the same test as did the district court"); *Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 730 (9th Cir.1983) (appeals court reviews "*de novo* orders dismissing for lack of subject matter jurisdiction"); *Weahkee v. Perry,* 587 F.2d 1256, 1263 (D.C.Cir.1978); 5 B. Mezines, J. Stein, & J. Gruff, Administrative Law § 51.04 (rev. ed. 1985) (court engaged in de novo review is not confined to the administrative record, but may pursue whatever further inquiry it finds necessary or proper to the exercise of court's independent judgment).[9]

Essentially then, the district court's charge was to put itself in the agency's place, to make anew the same judgment

earlier made by the agency: Were the amendments Doe requested needed to maintain the record of the March 26, 1981 interview "with such accuracy ... and completeness as is [reasonably] necessary to assure fairness" to Doe? 5 U.S.C. § 552a(g)(1)(C).[10] The district judge correctly understood that charge.[11] He observed that Privacy Act "procedural rights" were not "a dispositive issue." *See Doe, supra,* slip op. at 9. Rather, the district judge stated, the "proper issue," the one requiring his de novo determination, concerned the "accuracy" of the March 1981 ROI for agency purposes. *Id.* at 9–10; *see* 5 U.S.C. § 552a(e)(6), *supra* at 697–98. The judge then proceeded to determine, positively and without words of obeisance typical of review under the "arbitrary and capricious" or "substantial evidence" standard:[12] "We conclude that here accuracy is best served by supplementing the Agent's Report with the plain-

9. *See also Doe v. United States Civil Service Comm'n,* 483 F.Supp. 539, 578–79 (S.D.N.Y. 1980) (court is authorized to take supplemental evidence in aid of its own, independent determination whether a record should be amended, but need not "sit as trier of fact while the plaintiff cross-examines the two sources who spoke against her"). The expression "de novo" may also be used when no record supplementation is involved, but the legal issue presented is to be reviewed nondeferentially. *See, e.g., Commodity Futures Trading Comm'n v. Schor,* —— U.S. ——, 106 S.Ct. 3245, 3259, 92 L.Ed.2d 675 (1986) (legal rulings of the CFTC are subject to de novo review). *But cf. McGehee v. Casey,* 718 F.2d 1137, 1148 (D.C.Cir.1983) (Wald, J.) ("reviewing courts should conduct a *de novo* review of [CIA] classification decision, while giving deference to reasoned and detailed CIA explanations of that classification decision").

10. Section 552a(g)(1)(C), in the portion of the Act dealing with civil remedies, tracks in large part the language of § 552a(e)(5), in the portion on agency record-keeping obligations. The latter uses the phrase "reasonably necessary to assure fairness"; the former does not include the word "reasonably." We attribute no substantive significance, for the issue at hand, to the omission of the word "reasonably" in § 552a(g)(1)(C). The key element of the standard—the necessity "to assure fairness in any determination"—calls for a balanced judgment, one inherently involving a reasonableness criterion. *See Edison v. Department of the Army,* 672 F.2d 840, 843 (11th Cir.1982) ("reasonable-

ness" standard explicit in 5 U.S.C. § 552a(e)(5) is implicit in 5 U.S.C. § 552a(g)(1)(C)).

My dissenting colleagues comprehend de novo review in this case to necessitate trial in the district court. But if the court is to make anew the same judgment earlier made by the agency, and the Privacy Act concededly does not oblige the agency to hold a hearing, *see supra* note 3, then it is difficult to understand why a court must accord a *first* hearing to something the agency was not obliged to hear, and in fact did not hear. As cases cited *supra* in note 9 and accompanying text (*Augustine, Clayton, Schor*) indicate, de novo review, in diverse contexts, does not entail any trial-type hearing.

11. As we have pointed out, *see supra* note 10, for the purpose at hand, the standards for the record-keeping agency, 5 U.S.C. § 552a(e)(5), and for the reviewing court, 5 U.S.C. § 552a(g)(1)(C), are substantively the same. We therefore attribute no significance to the district court's citation to the former rather than the latter subsection in reporting that the court had determined de novo not "what was said during the March 26, 1981 interview," but whether the Department had maintained the ROI with the accuracy required "to assure fairness." *See Doe, supra,* slip op. at 10.

12. *See United States v. Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 1414, 10 L.Ed.2d 652 (1963) (distinguishing between de novo review on the one hand, and "arbitrary and capricious" or "substantial evidence" review on the other).

tiff's denials and other information." *See Doe, supra,* slip op. at 11.

In sum, the district judge made the same judgment earlier entrusted to the agency head, and he apparently did so for himself, *i.e.,* on the basis of information he found sufficient to make the judgment, and without deferring to the prior agency conclusion on the same matter. Having clarified that *how* the court is to determine the matter is not in doubt—the determination is to be made *de novo*—we turn to the critical question in this case: Just *what* is "the matter" to be determined?

### III.

■ The parties delineate "the matter" at stake differently. According to Doe, "the matter" to be determined is this: Which version of the March 26, 1981 interview—Doe's or the agent's—does the State Department, and subsequently and independently, the court, choose to believe? Absent that credibility determination, Doe contends, impermissible inaccuracy infects the record. According to the government and the district court, "the matter" to be determined is not what Doe in fact said at the interview. Instead, the dispositive "matter" is whether the March 1981 ROI, as currently composed, meets the Privacy Act's instruction that all records concerning individuals be maintained "with such accuracy ... and completeness as is necessary to assure fairness ... to the individual." 5 U.S.C. § 552a(g)(1)(C). We hold, in agreement with the district court and the Department, (1) that the Privacy Act establishes as the recordkeeper's polestar, "fairness" to the individual about whom information is gathered, and (2) that the "fairness" criterion does not demand a credibili-

ty determination in the atypical circumstances of this case.[13]

In the typical Privacy Act case, as the district court observed, it is feasible, necessary, and proper, for the agency and, in turn, the district court to determine whether each filed item of information is accurate. *See Doe, supra,* slip op. at 10, 11. The Act was designed to create "a code of fair information practices" to govern "federal agencies that collect, store, and disseminate personal information about [individuals]." *Smiertke v. United States Department of Treasury,* 447 F.Supp. 221, 224 (D.D.C.1978), *remanded on other grounds,* 604 F.2d 698 (D.C.Cir.1979). An agency, we think it plain, dishonors the Privacy Act standard of "accuracy ... necessary to assure fairness" if it collects and keeps without careful investigation derogatory information from unreliable sources or of a kind that could be run to earth with a reasonable degree of certainty. An agency will not have "done what is reasonable in assuring the accuracy of [its] information," *Edison v. Department of the Army,* 672 F.2d 840, 843 (11th Cir.1982), if it squirrels away, deliberately or out of bureaucratic habit, unsubstantiated rumors, McCarthyesque innuendo, unchecked reports of dubious informers or prying neighbors. *See* H.R.Rep. No. 93–1416, 93d Cong., 2d Sess. 4–5 (1974).[14]

■ The Department in this case, however, did not neglect its statutory duty to "assure fairness" when individuals, situated as Doe is, complain. Mindful that "only [Doe] and the reporting agent ... were present during the [March 26, 1981] personal interview," the Department considered it particularly important to verify the ROI contents, to the extent possible, against the "factual record," *i.e.,* Doe's VA file and her educational records.[15] By

---

**13.** We emphatically do *not* "claim" or hold that "the court need only ascertain the reasonableness or fairness of the Department's response to Doe's request." *See* Dissent of Judge Mikva at 708, 711. What the court must ascertain, we reiterate, is whether the record is maintained with the accuracy "necessary to assure fairness." 5 U.S.C. §§ 552a(e)(5) & (g)(1)(C).

**14.** The reasonable record-keeper, guided by a standard stressing fairness, should be particu-

larly vigilant in requiring independent, reliable verification of undocumented damaging bits of information gathered from third parties. *See Doe v. United States Civil Service Comm'n,* 483 F.Supp. 539, 579–80 (S.D.N.Y.1980).

**15.** Memorandum to Marvin L. Garrett, Jr., *supra* note 6, at 1, *reproduced in* J.A. at 49 ("It is important to establish credibility based on factual record, if possible, since only [Doe] and the

checking or rechecking Doe's amendment requests against documentary evidence, the Department was able to resolve a number of issues. In some instances, State granted Doe's request and corrected the ROI as she proposed; in other instances, the Department rejected her claim, pointing to the refutation of it in her VA file.[16]

Only when the Department had narrowed the controversy to *what Doe said* —as distinguished from what in fact existed in the world outside the Doe/Hughes interview—did the Department allow the conflicting accounts to stand together as part of the ROI. The Department settled on that course, we note, only upon finding no reason to doubt that agent Hughes had acted with integrity and in the manner expected of him. *See supra* note 7 and accompanying text. The verification steps and checks undertaken by the Department, and the corrections made based upon that review, the district court indicated and we conclude, rendered the March 1981 ROI a record maintained with the accuracy and completeness reasonably required to assure fairness to Doe. *See supra* notes 10–13 and accompanying text.

These were the choices the Department faced once it resolved every issue save what Jane Doe said at the unwitnessed, untaped interview. First, State might have capitulated to Doe's insistence that the ROI be expunged unless the Department, in a trial-type proceeding, determined where the truth lay. *See* Appellant's Brief at 51–55 (examination and cross-examination of Doe and Hughes are essential).

Second, having found "no indication that Agent Hughes acted in any manner other than what was expected of him,"[17] the Department might simply have rested upon Hughes's report of Doe's words, and flatly refused Doe's record amendment request to the extent that it concerned what Doe said. In that event, Doe would have had the statutory right "to file with the [Department] a concise statement setting forth the reasons for [her] disagreement with [State's] refusal" to amend the record. 5 U.S.C. § 552a(d)(3). In any disclosure of the ROI to other agencies or persons outside the government, State would have been obliged to note "any portion of the record which is disputed" and to "provide copies of the [objector's] statement." *Id.* § 522a(d)(4). If the Department deemed it appropriate, however, it could have added to the disclosure its "reasons ... for not making the amendments requested." *Id.*

Third, the choice in fact made by the Department, State could recognize that what Doe said at the March 26, 1981 interview is indeed "unknowable" by third persons, and that, consequently, a file setting out both Hughes's version and Doe's may be more accurate than a record embracing only one side's story. *See Doe, supra*, slip op. at 11 (district court's conclusion that choice Department made best served accuracy).

Did the Department, in effect, do no more than the law already required of it in allowing Doe to include in the record her version of what she said? There is a genuine difference, we believe, between the ROI State maintained, which comprehends that truth may lie in the middle ground between divergent accounts each affirmed by one

---

reporting agent ... were present during the personal interview....").

**16.** The Department acknowledged that Doe was correct on these matters:

    1) Doe's last post prior to retirement was not the Panama Canal Zone;

    2) Doe had not withdrawn from her courses at Daytona Beach Community College;

    3) Doe had not been denied admission to Georgetown University's School of Foreign Service prior to enrolling at Daytona Community College.

In addition, Agent Hughes conceded that Doe had not used the term "fraudulent" in reference to her actions.

The Department also determined, contrary to Doe's assertions, that:

    1) Doe had in fact filed a disability claim for VA compensation;

    2) Doe had been diagnosed as a manic depressive;

    3) Doe did receive compensation based, in part, on that manic depressive illness.

*Id.* at 6–7, 14 *reproduced in* J.A. at 54–55, 62.

**17.** *See supra* note 7.

witness,[18] and a ROI that labels the government agent's account "true" and the interviewee's supplement "false." Moreover, by taking the course it did, State relinquished the right to speak the last word—to accompany any disclosure of the ROI with its own statement of the reasons why it rejected the amendments requested by Doe. *See* 5 U.S.C. § 522a(d)(4).

Did Congress allow the Department to choose a middle way, or does the Privacy Act rigidly adopt an adjudicatory model forcing a decision for one side and against the other? District judges, of course, sitting alone or instructing juries, are "at home" with the task of finding what "truth" is more probable than not. But judges so engaged know that they, or the juries they instruct, make definitive findings out of necessity; a winner must be declared, although in the generality of civil cases that go to trial, a decision for either side would be reasonable. We do not discern in the Privacy Act any unyielding instruction always to adjudicate in that customary bipolar way so as to find and record

"truth," rather than to adjust a file equitably to reveal actual uncertainty.[19]

CONCLUSION

The Department fulfilled its responsibility under the Privacy Act when it verified the March 1981 ROI, to the extent possible, against the factual record, and narrowed the controversy to Doe's statements at the March 26, 1981 interview. Having no reason to doubt that its agent Hughes acted with integrity in the manner expected of him, the Department refused to expunge Hughes's version of the interview. At the same time, the Department complemented the ROI with Doe's conflicting account of the interview. Reviewing the Department's performance, and arriving at its own judgment of how "accuracy is best served" in this case, *Doe, supra,* slip op. at 11, the district court thought it a fair accommodation, one consistent with the Privacy Act's terms and purposes, to retain as part of State's ROI the contradictory descriptions of agent Hughes and interviewee Doe, the two sole participants in, and auditors of, the episode in question. We agree for the reasons stated in this opinion.[20]

---

**18.** *Cf.* A. Strindberg, *A Dream Play* 48 (M. Meyer tr. 1973) (In an exchange on truth, the Philosophy Dean asks: "What is truth?" The Law Dean replies: "That which can be proved by two witnesses.").

**19.** Under the "two actions" theory the Dissent of Judge Mikva delineates, *see supra* note 8, our "construction of judicial review may be an appropriate approach to a redress action," but "is [a] wholly inappropriate [approach] for an amendment case." Dissent of Judge Mikva at 712. We have already stated that the accuracy standard is the same in both cases. *See supra* note 8. And we are indeed unwilling to attribute to "the 93rd Congress," *see* Dissent of Judge Mikva at 706, a judicial review procedure pursuant to which an agency could be called to account for determining not to amend a record, 5 U.S.C. § 552a(g)(1)(A), even though it would be "appropriate" for the court simultaneously to hold that the record in question is indeed maintained "with such accuracy ... as is necessary to assure fairness." *Id.* § 552a(g)(1)(C). If a record is maintained with the requisite accuracy, then it needs no amendment. Conversely, if the record needs to be amended, then it is not maintained with the requisite accuracy. The endeavor in Judge Mikva's dissent to uncouple the requirement to amend from the requirement to maintain accurate records simply will not

wash. *See supra* note 8.

**20.** Chief Judge Wald, in her separate dissent, races away from the case that is, then lingers over "horribles" she describes in its stead. She asserts that we allow government to pack files with alleged damaging admissions "whatever the circumstances," and she dramatizes her concern by turning and returning to the example of "Communist associations, homosexual relations, or child abuse." Dissent of Chief Judge Wald at 704–05. Assertions of such associations or conduct, however, generally are susceptible of objective inquiry, so that an agency would be remiss—it would dishonor the Privacy Act standard of "accuracy ... necessary to assure fairness"—if it sought no independent verification. We have underscored this very point. *See supra* at 699–700.

Contrast the case at hand. The State Department proceeded from conceded fact: Doe wrote "no" when asked by State whether she had ever been treated for a mental condition. *See supra* p. 696. By careful checking or rechecking, the Department also found as fact what Doe had denied, but does not currently contest: she filed a disability claim for VA compensation; she had been diagnosed a manic depressive; she received compensation based in part on that illness. *See supra* note 16. Having made those

The judgment of the district court is therefore

*Affirmed.*

WALD, Chief Judge, dissenting:

I write separately because of my deep concern about the implications of today's majority decision for the future of the Privacy Act. By allowing agencies to retain in files maintained on individuals accusations of alleged damaging admissions by the subjects of the files without any need to determine the accuracy of such accusations or their fairness to the individuals, the court writes out of the Act's protections a significant source of unevaluated yet potentially ruinous material, with critical consequences to the future of the individuals involved. The majority's rationale, unless cabined in some principled way I cannot find in its opinion, could pave the way for the return of the old-style government dossier replete with unfiltered and unproved charges.

## I. THE FACTS

In this case, the State Department's file on appellant Jane Doe includes a report submitted by a State Department agent named Billy N. Hughes. Hughes' report states that during his interview with Doe she admitted that she had faked an illness in order to get government disability benefits. Doe denies ever making such an admission during the interview and requested the State Department to amend its file on her by deleting the statement about the admission from the agent's report. The State Department responded:

It is possible that when Agent Hughes asked her about the VA benefits ... she did, in fact, tell Agent Hughes what he wrote in the [report]....

.    .    .    .    .

... [T]hose areas in contention (what she said or did not say) [shall] be made part of the record without affirming or denying her allegations where it is patently impossible to do so. The record should also indicate that there is no reason to question the integrity of Agent Hughes....

Joint Appendix (J.A.) at 59, 64.

Doe then sued the State Department, asking the District Court to order the State Department to delete the statement from its record. On the State Department's motion for summary judgment, the District Court dismissed Doe's claim. In its memorandum opinion, the District Court explained its decision: "[A] determination of truth or falsity was not possible since only two people were present at the interview and their recollection of what was said is so contradictory." J.A. at 17 (footnote omitted).

## II. WHAT THE PRIVACY ACT REQUIRES

The Privacy Act grants an individual the right to request an agency to amend a record pertaining to her when "the individual believes" that "any portion" of the record "is not accurate." 5 U.S.C. § 552a(d)(2). If the agency refuses the amendment request, the individual may bring a civil action against the agency in a federal district court. *Id.* § 552a(g)(1)(A). "In such a case the court shall determine the matter de novo." *Id.* § 552a(g)(2)(A).

Section (d) does not itself state any standard of proof that an agency must use in deciding whether to grant a request to amend. Section (e), however, states that an agency must "maintain all records which are used by the agency in making any determination about an individual with such accuracy ... as is reasonably neces-

findings, the Department could take objective inquiry no further. The conflicting assertions it let stand, we reiterate, concerned not what Doe did, *e.g.,* filed an application, joined an association, battered a dependent, but why.

Our decision is indeed narrow and does not purport to decide cases yet unseen. It does not, as Chief Judge Wald supposes, exonerate agencies of "any need to determine the accuracy of

[alleged damaging admissions] or their fairness to the individuals." Dissent of Chief Judge Wald at 702. It is securely cabined by its facts: an experienced agent whose actions and integrity the Department found no tenable reason to question; an agency that diligently investigated all facets of the matter susceptible of objective verification. That is the case before us; we rule on no other today.

sary to assure fairness to the individual in the determination." *Id.* § 552a(e)(5). In the context of a request to amend an allegedly inaccurate record, this standard obviously requires that there be a sufficient likelihood that the contents of the record are accurate enough so that denying the amendment request is "fair" to the individual involved.

In many cases, perhaps most, fairness to the individual will require that the disputed material be more likely accurate than not.[1] But fairness may not always demand proof of accuracy by a preponderance of the evidence. In some instances, a lesser burden—like substantial evidence—might suffice. The crucial point, however, is before an agency may deny an amendment request, it must determine that the material in its records is sufficiently likely to be accurate that keeping the material in the record is fair to the individual. If the agency cannot determine that keeping the information in the file is fair, then it must grant the amendment request, either by correcting the material or by deleting it from the record. Otherwise, the agency fails to fulfill its statutory duty to "maintain all records ... with such accuracy ... as is reasonably necessary to assure fairness to the individual."[2]

The majority, however, refuses to apply this statutory standard to the present case. Instead, the majority allows the State Department to keep in its records Agent Hughes' assertion that Doe admitted to faking an illness to receive government benefits as long as the State Department also includes in its record Doe's denial that she made this admission to Hughes. According to today's decision, neither the State Department nor the District Court needs to evaluate the accuracy of Hughes' statement or determine whether keeping it in the file is fair to Doe.[3]

Certainly lawyers and judges who read the majority's decision must ask themselves: "Just what is the rule of the case? On what principle, if any, is it based?" I frankly cannot answer these questions. The majority, at one point, protests emphatically that its holding would not apply to different circumstances in which one person claims that another admitted something damaging in an unrecorded and unwitnessed conversation. *See* Maj. op. at 701 n. 20. The majority tells us that its "decision ... is securely cabined by [the following] facts: an experienced agent whose actions and integrity the Department found no tenable reason to question; an agency that diligently investigated all facets of the matter susceptible of objective verification." *Id.* But this language does little, if anything, to delineate just when the agency can invoke the "no decision" rule in contrast to when it must make a decision that the disputed admission is or

1. In a case, like this one, in which an individual seeks government employment, the fairness of keeping material in a personnel file depends upon how injurious it is likely to be to future job possibilities for the individual. The more injurious a statement is, the greater the agency's confidence in the accuracy of the statement must be in order for the agency to deny an amendment request.

2. If the case reaches court, the trial judge must make the same determination. Should the District Court fail to undertake this inquiry, it would stand in breach of its statutory obligation to "determine the matter de novo."

3. Whenever an agency refuses an amendment request, it "must permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency." 5 U.S.C. § 552a(d)(3). This requirement is independent of the agency's duty under § (e)(5). The majority nevertheless states that there is a difference between a case in which the agency determines that the individual, more probably than not, made the alleged admission but permits the individual to register her denial, as mandated under § (d)(3), and a case in which the agency simply includes in the record both the allegation and the denial without deciding which is more accurate. *See* Maj. op. at 700.

I agree that there is a crucial difference between the two cases. In the first case, the agency has determined that the allegation is sufficiently likely to be accurate that keeping it in the record is fair to the individual. In the second case, the agency has effectively stated, "No matter what is the likelihood that the allegation is inaccurate, it will stay in the record." This second decision, unlike the first, contradicts the statutory requirement that the agency "maintain [its] records ... with such accuracy ... as is reasonably necessary to assure fairness to the individual."

is not accurate enough to be fair. Does the majority's holding depend upon the fact that the statement about Doe was made by one of the State Department's own agents, as opposed to an "outside" individual like one of Doe's neighbors? Or would today's decision be the same if a neighbor had made the statement about Doe, as long as the State Department had no reason to question the neighbor's integrity and had "diligently investigated all facets of the matter susceptible of objective verification"?

In addition to being fuzzy, the majority's reasoning is untenable. First, the fact that the agency has no reason to doubt the integrity of Doe's accuser does not justify an exception from the statutory standard, although it might be relevant to the agency's evaluation of the likelihood that the person's statement about Doe is accurate. Indeed, in some cases the agency's confidence in the integrity of its own agent (or even a highly reputable private citizen) might itself provide a basis for the conclusion that the disputed assertion is sufficiently accurate to be fair. The critical difference between the majority and myself is that I can find no warrant in the Act for dispensing with the duty to decide if the statement is accurate enough to be fair. Suppose, for a moment, that the statement about Doe in the State Department's file was that she had admitted to past Communist associations, homosexual relations, or child abuse. If Doe claimed that the statement was inaccurate and requested its deletion from the State Department's records, it certainly would not be fair under the Privacy Act for the State Department or the District Court to deny this request, without judging the accuracy of the statement, because the State Department had

no reason to "question" the integrity of Doe's accuser.[4]

Next, the majority draws a distinction between those cases in which an agency has done all that it can to verify "objective[ly]" whether the subject of its file did what she allegedly admitted to doing, and those cases in which the agency has not conducted an objective investigation. See Maj. op. at 701 n. 20. But, again, I do not understand why this distinction should ever allow an agency to evade its duty under the Privacy Act to judge the accuracy of its records when faced with a claim that a record is inaccurate.

In some cases, an agency may be able to find objective evidence that an individual did what she allegedly admitted to doing. For example, if the assertion in the agency's record is that Doe admitted to membership in the Communist Party, an examination of the Party's membership list would reveal whether her name was on the list. This evidence would be relevant to whether she told someone that she was a member of the Party and the agency certainly could consider this evidence in judging the accuracy of that assertion, if she continued to dispute its accuracy.

In other cases, however, no such "objective" evidence may exist. For example, proof of the act of child abuse, sexual harassment, or a homosexual relationship itself often turns on one person's word against another's, in the very same way as proof of an admission to engaging in these kinds of activities does. To use the Communist associations example, what if the only "objective" evidence were that Doe was seen attending several meetings of a Communist-front organization? An agency investigator asserts that, when asked why she participated in these meetings, Doe said that she was a Communist. Doe, how-

---

**4.** I raise these examples of potentially damaging admissions to test the logical limits of the majority's holding. The majority nowhere includes in its calculus the extent of the damage to the individual that the alleged admission may cause. As I have indicated, see, supra n. 1 and accompanying text, I believe that fairness may not require the same degree of accuracy for all possible assertions about an individual. If the disputed statement about Doe were that she admitted to fixing a good stiff drink once in a

while, fairness might only require that the accuracy of this statement be "reasonably likely." But in all cases under the Privacy Act the agency and the court must determine that the disputed assertion is *sufficiently* likely to be accurate to assure fairness to the individual involved. In no case, may the agency or the court conclude that it is "impossible" to make a judgment about the accuracy of the disputed assertion, but the assertion may remain in the agency's file anyway.

ever, denies making such a statement and claims she had no idea that the organization was Communist-controlled. According to today's decision, the investigator's assertion could presumably remain in the agency's file without either the agency or the court evaluating its accuracy. I hope I am wrong, but I find no logical distinction at all in the majority's rationale to distinguish this example from the case decided today.[5]

In the end, the majority bases its holding in large measure on the grounds that what one person told another in a conversation attended only by the two is "unknowable". by third persons. *See* Maj. op. at 700. But this reasoning cannot justify the exemption of alleged admissions, whatever the circumstances, from the statutory standard. It is obviously true that the agency cannot "know" with absolute certainty whether the individual in fact made the alleged admission. But the Privacy Act does not require absolute certainty about the accuracy of agency records. The Act demands only a sufficient likelihood that a disputed assertion about an individual is accurate to meet the standard of fairness. Agencies and courts are entirely capable of making this kind of judgment about alleged admissions. There is no basis in the text or legislative history of the statute for adopting a different rule for determining the accuracy of alleged admissions than the rule which governs other kinds of assertions about individuals.[6]

Thus, I have no sense at all about the scope of today's decision, or on what principle it is based that may or may not have application in future cases. Perhaps it is a ticket good for one ride only. Perhaps we now have "the trusted agent" exception to the statutory requirement that the agency and the court assess the accuracy of disputed statements about individuals in the agency's records. Read most hospitably, the majority's exception must at least extend to any case in which the agency has no reason to "question" the "integrity" of the person who assertedly heard the damaging admission and in which the agency has completed a search for "objective" evidence to back up one or the other's story. If the last description is accurate, then I fear today's decision covers a host of disturbing situations, because many alleged admissions involve matters that are not "susceptible to objective verification."[7] But regardless of the intended or actual scope of today's decision, it is an unjustified aberration from the legal rule mandated by § (e)(5) of the Privacy Act. There is no principled reason for deviating from the statutory requirement that the agency make an accuracy and fairness determination.

III. THE PROPER DISPOSITION OF THIS CASE

I would hold that the standard set forth in § (e)(5) applies in this case as in any

---

5. Consider another example. Suppose the only "objective" evidence that Doe had a sexual relationship with another woman was that they shared the same apartment and took their vacations together. The State Department's file contains a statement that Doe admitted (either to a neighbor or a State Department agent) to having a sexual relationship with this other woman. Doe denies ever making such a statement and claims that the two women were just roommates (and the other woman corroborates Doe's claim). May the statement that Doe admitted to the sexual relationship remain in the State Department's file, without an evaluation of its accuracy either by the agency or the District Court, as long as the agency includes in the file Doe's denial?

6. The majority's deviation from the statutory standard in this case is, I believe, caused by its misguided premise that the Privacy Act requires the agency or the court to judge the accuracy of

a disputed assertion only when it can do so with certainty, by "objective verification." This premise, of course, applies to any statement about what one person admitted to another in an unrecorded, unwitnessed conversation, and thus would lead to a conclusion that today's "no decision" rule governs all such alleged admissions. The majority rightly recoils at the implications of this rationale for the future of the Privacy Act, and consequently endeavors to limit its holding in some manner, although it fails to do so in any discernibly principled way. Rather than backtracking on the extent of its exception to the statutory standard, the majority should acknowledge that it went down the wrong road in the first place.

7. Indeed, whenever the alleged admission concerns not conduct itself but motives, intentions, or just plain thoughts, what the individual has allegedly admitted to is never "susceptible of objective verification."

other. The proper inquiry under this section, when an individual disputes the accuracy of material in a record pertaining to her, is whether the material is sufficiently likely to be accurate to assure fairness to the individual. The District Court is under the same obligation to conduct this inquiry as is the agency. *See, supra,* n. 2.

In this case, neither the agency nor the court conducted this inquiry. Instead, both claimed that it is "impossible" to determine whether Doe, in fact, had admitted to Hughes that she faked an illness to get government funds. But, as I have explained, the Privacy Act does not require either the agency or the court to judge the accuracy of the agent's statement about Doe in any absolute sense; and if, after conducting the proper inquiry, it remains "impossible" to say that the statement is sufficiently likely to be accurate to assure fairness to Doe, then the State Department may not keep the allegation in its record.

Since both the agency and the District Court failed to apply the correct legal standard, there remains the question of "how far" to remand this case for proper proceedings. Normally, one would send the case back to the agency; but because under the Privacy Act the District Court must determine the matter *de novo,* even if the agency had applied the correct legal standard, its decision would not be entitled to any deference. Therefore, it seems pointless to remand this case to the agency for an initial decision. Consequently, I would remand the case to the District Court for its *de novo* determination.[8]

I respectfully dissent.

8. On remand, the District Court would first decide what degree of accuracy fairness requires in this case: *e.g.,* preponderance of the evidence or substantial evidence. The court would then judge whether Hughes' statement about Doe met the appropriate measure of accuracy. In either case, the ultimate burden of proof remains with the plaintiff. *See Mervin v. FTC,* 591 F.2d 821 (D.C.Cir.1978). Thus, if fairness in this case turns on whether Hughes' statement is more likely accurate or inaccurate, then Doe would have to prove inaccuracy by a preponderance of the evidence. If, however, fairness demands only substantial evidence for the statement's accuracy, then Doe would have to prove that the agency lacked this substantial evidence.

MIKVA, Circuit Judge, with whom Circuit Judges SPOTTSWOOD W. ROBINSON, III, and HARRY T. EDWARDS join, dissenting: The court today creates a framework for judicial review of a government agency's management of responsibilities assigned to the agency under the Privacy Act of 1974, 5 U.S.C. § 522a (1982). It is a reasonable framework, one that might well have commended itself to the policymakers who wrote the Act. It is *not,* however, the judicial review procedure that the 93rd Congress provided. This reconstruction of what Congress wrote into a different statutory scheme may appear more sensible to the majority, but it is not faithful to our responsibilities of legislative interpretation. I dissent from the majority's revisionism.

## I

The Privacy Act creates a panoply of duties and remedies for a broad range of situations in which the government might have caused harm to an individual by collecting or disseminating false or misleading information. The central command of the Act at issue here requires agencies to keep accurate records. Specifically, it provides that each agency must maintain all records pertaining to any individual with such accuracy as is reasonably necessary to assure fairness to the individual in any determination based on the records. 5 U.S.C. § 552a(e)(5).

To supplement the requirements placed on the agencies, Congress also provided for

I acknowledge that this two-tiered inquiry is not as simple as the rule adopted by my dissenting colleagues, according to whom fairness always requires that a material and potentially injurious statement about an individual be more likely accurate than not. *See* opinion of Mikva, J., at 709 – 710. Nevertheless, the flexible approach adopted here seems more in keeping with the statutory language. Section (e)(5) does not say that an agency's record must be "accurate," pure and simple. It says "such accuracy ... as is reasonably necessary to assure fairness." Given this language, I have trouble reading the District Court's duty as being, in all cases, one of deciding whether the record is either accurate or inaccurate by a preponderance of the evidence.

a system of petition and review. Pursuant to the Act, an individual can gain access to and review agency records that pertain to her. Furthermore, the Act permits the individual to request agency correction of any portion of a record that she believes is not accurate. The Act offers an agency two choices when faced with such a request: promptly, either make the requested correction or explain to the individual why it has refused to do so. Alternatively, of course, the agency is free to remove the challenged material altogether. The Act grants the individual the right to administrative review of the agency's refusal to make the amendments requested and the right to file a statement of disagreement with the agency setting out her side of the story. According to the Privacy Act Guidelines promulgated by the Office of Management and Budget, the individual's statement of disagreement may be included separately or made an integral part of the record to which it pertains. *See Legislative History of the Privacy Act of 1974,* 1055 [hereinafter "Source Book"]. Pursuant to the Act, whenever the agency discloses the disputed records, it must include this statement and clearly mark the records to indicate the portions in dispute.

The Act also provides civil remedies, two of which are relevant to this case. First, the Act provides for judicial review whenever an agency decides not to amend an individual's record as requested (an "amendment" action). In an amendment action, the Act provides that the reviewing court shall "determine the matter de novo" and grants the court the authority to order the agency to amend its records regarding the plaintiff. 5 U.S.C. § 552a(g)(1)(A) & (g)(2)(A). Second, the Act grants a cause of action to an individual whenever she is harmed as a result of the agency's failure to maintain its records with the accuracy required by the Act (a "redress" action). The Act renders the government liable for damages, costs, and attorney fees in such cases when its failure to maintain accurate records was "intentional or willful." *Id.* § 552a(g)(1)(C) & (g)(4). Unlike amendment actions, the Act does not stipulate the court's standard of review in redress actions.

The majority correctly portrays Doe's Privacy Act request for access to and amendment of the security record maintained by the Department in connection with Doe's application for employment in the Foreign Service. Doe's request centered on a Department "Report of Investigation" (the "March ROI") concerning an unwitnessed interview between Doe and a State Department agent. The majority, however, mischaracterizes the agency's response to Doe's request. The majority asserts that the Department fashioned some novel resolution, whereas in fact the agency responded exactly as contemplated by the Act. As to certain matters, the Department made corrections in the March ROI; as to others, particularly the agent's account of admissions made by Doe during the interview, the agency determined that the information met the accuracy requirements of the Act and refused to amend the March ROI as Doe requested, retaining the disputed information in Doe's file. In informing Doe of the reason for its refusal, the Department advised Doe that it had no reason to question the integrity of its agent. As obliged under the Act, the Department then included in the ROI Doe's counterstatements to the disputed, unamended portions. The Department also notified Doe of her statutory right to seek judicial review of her request for amendment.

Doe's subsequent lawsuit sought relief from the State Department pursuant to the Act's civil remedy provisions. The district court construed Doe's complaint as stating two claims under the Act—one under the amendment provisions and one under the redress provisions. *See Doe v. United States,* Civ. Action No. 83–00951, slip op. at 6 (D.D.C. July 1, 1984). Relevant to her amendment action, Doe contested the Department's decision not to expunge portions of the March ROI as she requested. Doe contended that the agency should have granted her request because the March ROI's account of Doe's statements made during her interview with the agent is inaccurate. Relevant to her redress action,

Doe argued that the agency had willfully failed to maintain its record concerning her with such accuracy as is necessary to assure her fairness and that as a result of this failure, security clearance for her present position had been delayed and she had not been considered for certain other government positions. Doe rested her second claim entirely on the agency's failure to conduct an extensive investigation into the accuracy of the agent's version of the interview. She asserted that this failure entitled her to expungement of the ROI and to damages. The district court granted summary judgment for the State Department on both claims. Doe does not challenge the district court's determination that the procedural arguments of her redress claim are meritless. *See* Majority Opinion (Maj.Op.) at 695 n. 3. Thus, as the State Department observed at oral argument before the en banc court, the only issue before this court is the district court's resolution of Doe's amendment claim.

## II

The majority pitches Doe's appeal by using a most selective statutory analysis. The majority couches its opinion in terms of reviewing Doe's redress claim, an issue not before the court, and ignores the issue that is before the court, Doe's amendment claim. In deciding the wrong question, the majority denies Doe her statutory right to judicial consideration of her amendment request and recasts the Act's provisions for judicial review.

My disagreement with the majority is over "the matter" that the Act calls upon the court to determine in this case. Doe's amendment claim required the district court to review *de novo* the State Department's decision not to amend the March ROI as Doe requested. Doe's amendment request challenged the truth of the March ROI. Thus, whereas the majority claims the court need only ascertain the reasonableness or fairness of the Department's response to Doe's request, the court in fact must determine the accuracy of the March ROI. In avoiding this inquiry, the majority renders meaningless the *de novo* review

provided by Congress. Once the court's duty under the Act is properly understood, the impropriety of the district court's dismissal of Doe's claim on summary judgment is plain.

### A

The term "de novo" is hardly vague—to a court of law. *De novo* review calls upon the court to "make an independent determination of the issues." *United States v. First City National Bank*, 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967); *accord Chandler v. Roudebush*, 425 U.S. 840, 861–64 & n. 39, 96 S.Ct. 1949, 1959–61 & n. 39, 48 L.Ed.2d 416 (1984). The court should determine the matter "anew," Black's Law Dictionary 392 (5th ed. 1979), without deference to the prior administrative proceedings and decision. *See, e.g., Weahkee v. Perry*, 587 F.2d 1256, 1265 (D.C.Cir.1978). Thus, the court must "determine for itself whether the [amendment] request should have been granted" on the basis of the evidence that was available to the agency and any supplemental evidence presented to the court. *White v. Office of Personnel Management*, 787 F.2d 660, 663 (D.C.Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 276, 93 L.Ed.2d 252 (1986); *see Doe v. United States Civil Service Commission*, 483 F.Supp. 539, 578–79 (S.D.N.Y.1980).

Since the court's task is to render anew the decision earlier entrusted to the agency, the court's charge is shaped by the agency's charge under the Act—establish that the disputed record is accurate. See OMB Guidelines at 40, Source Book at 1053. The agency's responsibility when faced with an amendment request corresponds to the individual's right to seek access to agency records. The legislative history shows that the Act provides individuals access to records pertaining to them so that they can detect misinformation and seek corrective amendments to inaccurate documentation; the provision is aimed, in part, at improving the accuracy of governmental records. *See* S.Rep. No. 93–1183, 93d Cong., 2d Sess. 20 (1974), Source Book

at 173; H.R.Rep. No. 93–1416, 93d Cong., 2d Sess. 2 (1974), Source Book at 295.

Although the statute does not instruct the agency on the standard it must use in judging an amendment request, the standard of accuracy is best understood as that independently required of the agency under the Act. The legislative history of the Act makes clear that the individual's right to correction under the access provision complements the agency's duty to maintain accurate records. *See* S.Rep. No. 93–1183 at 50, Source Book at 203; H.R.Rep. No. 93–1416 at 15, Source Book at 308. Accordingly, when considering an amendment request, the proper inquiry for the agency is whether the challenged record is as accurate "as is reasonably necessary to assure fairness to the individual in [any] determination" which may be made about the individual on the basis of the record. 5 U.S.C. § 552a(e)(5); *see* OMB Guidelines at 40, Source Book at 1053.

This statutory standard of accuracy is directed to ensuring that agency decisions affecting the individual will be based on accurate information. The overall objective of the standard is fairness to the individual. In order to assure such fairness, it is not "reasonably necessary" that all information contained in agency records be accurate. Only material and potentially injurious information need be accurate to assure fairness to the subject individual in any determination based on the information. That much, at least, is reasonably necessary. Thus, if the agency is likely to rely on the disputed information in making a determination about the subject individual and if the information is likely to be injurious to the individual if relied upon by the agency in making this determination, then the statutory standard demands that the agency, faced with an amendment request, determine that the information is accurate.

The burden is on the individual to establish the inaccuracy of the challenged record. *See* OMB Guidlines at 38, Source Book at 1051 (advising agencies to place the burden of going forward in an amendment request on the individual); *Mervin v.*

*F.T.C.,* 591 F.2d 821, 827 (D.C.Cir.1978) (holding that the reviewing court correctly places the burden of proof on the plaintiff seeking amendment). The OMB Guidelines suggest that the agency should grant an amendment request if it determines by a preponderance of the evidence that the record is inaccurate. OMB Guidelines at 38, Source Book at 1051. The few courts that have addressed amendment claims have not articulated the standard of proof they applied. Nevertheless, they appear to have adopted the ordinary rule applicable in civil actions, imposing a preponderance of the evidence standard on the plaintiff. *See, e.g., Thompson v. Department of Transportation United States Coast Guard,* 547 F.Supp. 274, 281, 282–83 (S.D. Fla.1982) (holding that based on evidence before the court, plaintiff had failed to establish inaccuracy warranting amendment); *Zeller v. United States,* 467 F.Supp. 487, 502–03 (E.D.N.Y.1979) (denying plaintiff's request for amendment because "there is no question that the statements contained within [the records] are factually accurate in all material respects"). In the absence of contrary indications from Congress, this traditional preponderance of the evidence standard is appropriate.

In sum, in an amendment case, the court, like the agency, must determine for itself whether the disputed agency record is as accurate as is reasonably necessary to assure fairness to the plaintiff in any determination based on the record. Assuming the disputed information is both likely to be relied upon in agency determinations and likely to injure the individual in those determinations if inaccurate, this inquiry requires the court to decide if the plaintiff has shown by a preponderance of the evidence that the record is inaccurate.

Such a *de novo* review standard makes amendment cases unlikely prospects for disposal on summary judgment. *See Savarese v. United States Department of Health, Education and Welfare,* 479 F.Supp. 304, 307 (N.D.Ga.1979), *aff'd mem.* 620 F.2d 298 (5th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). The only material issue in such cases is whether the disputed record is

accurate. Whether the agency record is accurate is a factual matter about which the parties vehemently disagree, and where issues of material fact are in dispute summary judgment is inappropriate. Fed.R. Civ.P. 56; *see, e.g., Doe v. United States Civil Service Commission,* 483 F.Supp. at 556 (denying motion for summary judgment because accuracy of challenged record is in dispute); *Savarese,* 479 F.Supp. at 307 (same). It may be that when a plaintiff presents virtually no evidence regarding the inaccuracy of the disputed report, the court may resolve the case on summary judgment. *See, e.g., R.R. v. Department of the Army,* 482 F.Supp. 770, 775 (D.D.C.1980) (resolving amendment action on summary judgment where "[n]o matters of material fact [were] in dispute"). But when the individual proffers evidence tending to show that the report is inaccurate, the case is not ripe for summary judgment. There has to be something resembling a trial on the fact issues in dispute.

The majority doubts that *de novo* review obliges the court to accord a "trial-type hearing" on an issue that the agency was not required to hear in the first instance and in fact did not hear. *See* Maj.Op. at 698 n. 10. *De novo* review requires the court to assess the issues "as it does in any civil matter tried to the court." *Weahkee,* 587 F.2d at 1265. The court determines the accuracy of a factual matter in a civil action in only one way—by hearing and considering the conflicting evidence. When the court's judgment on the credibility of witnesses could be determinative, then the court should hear their testimony. *See id.* at 1266 (holding that the trial court inappropriately resolved the case containing "hotly disputed" material facts "without hearing any testimony from the parties most directly involved"). Other courts addressing amendment actions have so understood the Act's *de novo* review commands. For example, in *Thompson, supra,* the trial court reached the conclusion that the agency need not "correct" the challenged information only after "having considered the pleadings, the testimony of the witnesses, the exhibits, stipulations and argument of counsel, and the applicable law." 547 F.Supp. at 274. Even as a matter of first impression, it is not clear that the majority's seeming preference for limited judicial review is correct. The judiciary is an institution uniquely devoted and suited to determining factual controversies. In carrying out a task as sensitive as ensuring the accuracy of the government's records, it is not at all odd that Congress should employ this finely-honed, truth-divining mechanism as a check on the inclusion of inaccurate or questionable information in the government's records—particularly since individuals may not be provided procedural protections before the agency. ·

The Privacy Act is not unusual in providing for the first hearing on a factual issue before the court on *de novo* review of an agency's determination. *See, e.g., First City National Bank, supra,* 386 U.S. at 368–69, 87 S.Ct. at 1093–94 (interpreting the *de novo* review provisions of the Bank Merger Act and envisioning a judicial proceeding that includes a hearing); *United States v. Idaho First National Bank,* 315 F.Supp. 261 (D.Idaho 1970) (following *First City* and conducting a trial on *de novo* review). In the cases cited by the majority, there is no material factual issue in dispute; the courts in these cases are conducting *de novo* review of an agency's or trial court's determination of legal issues. *See* Maj.Op. at 698 n. 10. Obviously, in such instances *de novo* review, like review in any civil action, does not entail a trial-type hearing.

## B

Applying these principles to Doe's amendment claim, the court must determine whether those sections of the March ROI that the State Department refused to amend, as they existed at the time Doe requested expungement, are as accurate as is reasonably necessary to assure fairness to Doe. The March ROI states that Doe admitted to dishonesty and to scheming to defraud the government; Doe denies having made such admissions. The Department compiled the information for its use in deciding whether to employ Doe for a

high level government job and whether to grant her security clearance should she be hired. In addition, the Department gave access to the report to other government agencies, including Doe's present employer, for similar uses. Given the nature of the disputed information and the use for which the Department maintained the record, the information is clearly material to agency determinations about Doe and likely to be injurious to her if inaccurate. Any agency considering Doe for employment might well doubt her suitability for a high level position based on her alleged admissions. The March ROI cannot "reasonably" assure fairness to Doe if the disputed information is inaccurate. Accordingly, Doe's amendment action calls upon the court to examine the accuracy of the disputed information.

The court must decide whether Doe has proven by a preponderance of the evidence that the agent's account of her admissions during the interview is inaccurate. Presumably, this determination will require the court to hear testimony from both Doe and the agent and judge the credibility of the two sharply conflicting versions of Doe's interview remarks. This task is admittedly difficult; ultimately, what transpired in the agent's interview with Doe is unknowable. But this is a task that courts regularly perform in other contexts—hearing the witnesses and deciding which one is telling the truth. No procedure will guarantee perfect accuracy in the records. To err in decision is unfortunately unavoidable even for judges. But the judge must reach a decision. It is the task set upon the court by Congress. The Privacy Act specifically directs the court to make a *de novo* determination of Doe's amendment request, and the factual issue of the accuracy of the March ROI is part of that determination.

Properly, this court should remand the case to the district court. The only material issue of fact—whether the March ROI's account of Doe's statements is inaccurate— is genuinely, and fundamentally, in dispute. The court itself recognized that if it was required to determine what was said during the interview, "there no doubt would be disputed issues of material fact." *See Doe v. United States, supra,* slip op. at 10. Given that the court *was* required to make this factual determination, the court erred in granting the Department's motion for summary judgment.

## C

The district court and the majority both achieve their result by distorting the statute which governs this case. The district court stated that agency "[r]eview of a record's accuracy is required when an individual seeks amendment of the record." *Doe,* slip op. at 6. But the court then inexplicably punted this task on review and concluded that in this case, the court is "not required by the statute to make a *de novo* determination of the ROI's accuracy." *Id.* at 10. The court thought it need only determine the "reasonableness" of the State Department's actions in response to Doe's amendment request. The majority affirms this approach. It sees the matter to be determined by the court as whether "the ROI, as currently composed," meets the Act's standard of accuracy and then sustains the agency's refusal to expunge the March ROI based on the "steps and checks undertaken by the Department" in adjusting Doe's file after her amendment request. *See* Maj.Op. at 699, 700.

What the majority ignores is that the focus of an amendment claim is not the agency's actions in response to the individual's request, but rather the merit of the request. *See White,* 787 F.2d at 663. Congress has mandated that the reviewing court determine *de novo* whether the challenged agency record should be corrected as requested. That mandate requires the court to consider the accuracy of the record, regardless of the reasonableness of the agency's record-keeping procedures. The proper subject of this inquiry is the agency record as it existed at the time of the request, not as it exists after the agency has fulfilled its statutory duty to insert the individual's statement of disagreement. Thus, whether the State Department acted reasonably in responding to Doe's request is irrelevant to the issue before the court.

The majority's construction of judicial review may be an appropriate approach to a redress action (although even in that context, I do not endorse the majority's application of the approach to this case). In a redress action, Congress has not provided for *de novo* review. *See White,* 787 F.2d at 663. Indeed, *de novo* review would be meaningless, since there is no agency determination to do anew; the Act contemplates that the individual will bring her complaint directly to the court. In a redress action, the court must determine whether the agency has "fail[ed] to maintain [the] record concerning [the] individual with such accuracy ... as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record." 5 U.S.C. § 552a(g)(1)(C); *see White,* 787 F.2d at 663. This inquiry properly focuses on the agency's record-keeping actions. Thus, it may be that "[i]f the court determines that the agency has done what is reasonable in assuring the accuracy of the information, no more is required." *Edison v. Department of the Army,* 672 F.2d 840, 843 (11th Cir.1982) (inquiring whether agency "acted reasonably" in the context of a redress action). This approach is wholly inappropriate for an amendment case, and therefore, not surprisingly, the majority can cite no amendment case that has followed the course it charts here.

Despite the majority's deliberate obfuscation, the Act itself plainly articulates two discrete civil remedies. *See* 5 U.S.C. § 552a(g)(1)(A) (amendment) and (g)(1)(C) (redress). Until the majority's opinion in this case, courts, including a prior panel of this court and the district court below, have consistently recognized the distinction. *See, e.g., White,* 787 F.2d at 663, and *Doe, supra,* slip op. 6–7. The two actions are not interchangeable.

Nor is there any inconsistency, as the majority intimates, stemming from the fact that both actions relate to the Act's requirement that each agency "maintain all records ... with such accuracy as is reasonably necessary to assure fairness to the [subject] individual." *See* Maj.Op. at 701

n. 19. The import of the language for each is markedly different. The Act's independent record maintenance requirement directs the agency to do what is reasonable in assuring the accuracy of the information included in its files. It speaks to the agency's system of record maintenance, collection, use and dissemination. *See* 5 U.S.C. § 552a(a)(3) (definition of "maintain"). The reasonableness standard permits the agency when operating this system to consider such factors as its own resources, the availability and scope of dissemination of the records, the value and relevancy of the record, the methods used in collecting the information, the sources employed, as well as the nature of the information and the likelihood that inaccurate records will cause injury to the subject individual.

A system of record maintenance that conforms with this statutory mandate may nevertheless result in inaccurate records. In this regard, the majority is incorrect in asserting that "[i]f a record is maintained with the requisite accuracy, then it needs no amendment." Maj.Op. at 701 n. 19. Recognizing that the statutory duty imposed on agencies may not be enough to ensure accuracy, Congress provided a "way for an individual to correct or amend an inaccurate record." H.R. No. 93–1416 at 9, Source Book at 302. The Act's access and amendment provisions are not simply policing devices; they are aimed at *improving* the accuracy of government records. *See Smiertka v. Department of the Treasury,* 447 F.Supp. 221, 226 (D.D.C.1978), *remanded on other grounds,* 604 F.2d 698 (D.C.Cir.1979). In this sense, they serve as necessary and desirable adjuncts to the agency's independent statutory duty. As the Senate Report notes, the provisions "promise to be the most viable of all the methods to guarantee the accuracy of data systems. Unlike more complex internal mechanisms, they are triggered by the most powerful and consistent of motives, individual self-interest." S.Rep. No. 93–1183 at 20–21, Source Book at 173–74, U.S. Code Cong. & Admin.News 1974, p. 6936. The provisions allow the agency to obtain the views of the individual with the greatest interest and ability to contribute

to the accuracy of the records. Congress respected the importance of this source of information to the accuracy of federal data gathering. Indeed, the Act requires agencies to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations." 5 U.S.C. § 552a(e)(2).

Once the individual presents evidence that contradicts the agency's information, the assessment of whether the agency's records are as accurate as is reasonably necessary to assure fairness begins anew, quite apart from the reasonableness of the agency's independent record maintenance system. In an amendment action, the individual is not challenging the agency's record maintenance system; she is challenging the accuracy of the records that the system has produced. Not surprisingly, the Act requires the individual to go to the agency in the first instance to seek correction. Since it is in the agency's best interest to have accurate records on which to rely and since no determination has yet been made based on the records, the agency should be given the first shot at assessing the necessity for correction in light of the subject individual's challenge and contradicting evidence.

By contrast, in a redress action, an individual directly challenges the agency's system of record keeping. The action presumes that the agency has failed to comply with the Act's accuracy requirements in that regard. When an agency has failed to maintain its records regarding an individual with the requisite accuracy and that failure has resulted in some adversity to the individual, the Act provides that the individual may repair to the court in the first instance for redress. An individual's success in a redress action is predicated on a finding that the agency has not taken reasonable steps to maintain the accuracy of its files. This determination is not necessarily measured by the degree to which the record may eventually be proven to correspond to the truth. *See Edison,* 672 F.2d at 843–44; *Fagot v. Federal Deposit Insurance Corp.,* 584 F.Supp. 1168, 1176 (D.P.R.1984). In a redress action, the individual is not challenging the accuracy of the agency record *per se;* she is challenging the reasonableness and fairness of the agency's record maintenance system that has produced the inaccurate record.

The two actions serve two very different, yet complimentary, purposes. One, the amendment action, is designed to prevent injury: the Act permits the subject individual to seek correction of inaccuracies that would be injurious to her if relied upon. The right of action accrues *before* a determination based on the record has taken place. The second, the redress action, is designed to compensate injury: the Act permits the subject individual to sue the agency for reparations when the agency's failure to maintain accurate records has injured her. The right of action accrues *after* an adverse determination based on the record has occurred. Both actions, in unique ways, encourage improvement of the informational quality of government records. But only the amendment action has the added salutary effects of protecting the individual from injury and providing the government with more accurate information before it acts. These are among the basic primary principles underlying the Act. In stripping Doe's amendment action of its force, therefore, the majority twice offends. Congress' intent in fashioning the Act's remedial provisions.

### CONCLUSION

The majority seems unsettled by the possibility that Congress meant "de novo" when it said "de novo." The legislative history suggests that the congressional concerns prompting the Privacy Act's enactment were such that only a "new trial" in court on the accuracy of the disputed material would meet those concerns. Whatever the concerns, Congress said "de novo." Such judicial responsibility cannot be carried out in a summary judgment proceeding in which the trial judge abjures the accuracy question and substitutes examination of the fairness of the agency's procedures for the statutory command.

*I dissent.*